Robert A. Klingler (0031603)
ATTORNEY FOR PLAINTIFF

## COURT OF COMMON PLEAS
## HAMILTON COUNTY, OHIO

| | |
|---|---|
| **TIMOTHY BAUMGARDNER**<br>1286 TIDEWATER DRIVE<br>MILFORD, OH 45150 | Case No. _____ |
| | Judge _____ |
| PLAINTIFF, | |
| v. | |
| **TENACITY MANUFACTURING<br>COMPANY**<br>4455 MULHAUSER RD.<br>HAMILTON, OH 45215 | |
| AND | |
| **LOUISIANA BINDING SERVICE, INC.**<br>300 AMPACET DRIVE<br>DERIDDER, LA 70634 | |
| AND | |
| **KOFILE PRESERVATION, INC.**<br>6300 CEDAR SPRINGS RD<br>DALLAS, TX 75235 | **COMPLAINT WITH JURY<br>DEMAND ENDORSED HEREON** |
| AND | |
| **WILLIAM D. OATES**<br>6300 CEDAR SPRINGS RD.<br>DALLAS, TX 75235 | |
| AND | |
| **PATRICK R. WILLIAMS**<br>1809 Lakeside Drive<br>DeRidder LA 70634 | |

AND                                          :
                                             :
**SCOTT WILLIAMS**                           :
300 AMPACET DRIVE                            :
DERIDDER, LA  70634                          :
                                             :
                                             :
          DEFENDANTS.                        :


   For his complaint against Defendants Tenacity Manufacturing Company, Louisiana

Binding Service, Inc., Kofile Preservation, Inc., William D. Oates, Patrick R. Williams, and

Scott G. Williams, Plaintiff Timothy Baumgardner states as follows:

### NATURE OF THE CASE

1.  This is a claim for breach of a written employment contract, tortious interference with the

employment contract, and conspiracy to breach the employment contract.

### PARTIES AND JURISDICTION

2.  Plaintiff Timothy Baumgardner is an individual residing in Milford, Ohio.  He was an

employee of Defendant Louisiana Binding Service, Inc., until he was terminated on May

13, 2011.

3.  Defendant Tenacity Manufacturing Company ("Tenacity") is a Delaware corporation

with its principal place of business in Hamilton, Ohio.  Tenacity employed Plaintiff

Baumgardner from approximately 1974 until he resigned to work for Louisiana Binding

Service, Inc. in January, 2010.

4.  Defendant Louisiana Binding Service, Inc. ("LBS") is a Louisiana corporation with its

principal place of business in DeRidder, Louisiana.  LBS employed Baumgardner from

January, 2010 until it terminated his employment on May 13, 2011.

ELECTRONICALLY FILED 09/30/2011 15:37  /  IFOJ  /  A 1107816  /  CONFIRMATION NUMBER 103240

5.     Defendant William D. Oates ("Oates") is an individual residing in the State of Texas. Upon information and belief, Defendant Oates was at all relevant times an officer and controlling shareholder of Tenacity, and became an officer and director of LBS and, directly or indirectly, the controlling shareholder of LBS, as a result of transactions described herein.   Oates is the secretary, officer, and director of Defendant Kofile Preservation, Inc.

6.     Defendant Kofile Preservation, Inc. ("Kofile") is a Delaware corporation with its principal place of business in DeRidder, Louisiana. Kofile is owned and controlled by Defendant Oates. Upon information and belief, one or both of Defendants Tenacity and LBS were merged into or acquired by Kofile, and Kofile is the successor-in-interest to Tenacity and/or LBS, and has assumed the assets and the liabilities of Tenacity and/or LBS.

7.     Defendant Patrick R. Williams is an individual residing in Louisiana. At all relevant times, Patrick Williams was the President and a shareholder of Defendant LBS. Patrick Williams is the Vice-President of Defendant Kofile.

8.     Defendant Scott G. Williams is an individual residing in Louisiana. At all relevant times, Scott Williams was Vice President and Treasurer and a shareholder of Defendant LBS. Scott Williams is President of Defendant Kofile.

9.     Baumgardner worked for LBS from his home in Ohio; LBS regularly does business in Ohio; and Plaintiff's claims arise from actions taken by LBS, Tenacity, Oates, Patrick Williams, and Scott Williams in the state of Ohio. This Court has jurisdiction over LBS, Oates, Patrick Williams, and Scott Williams because of their substantial contacts with the state of Ohio, and because the claims against them arise from their activities within Ohio.

- 3 -

## FACTUAL BACKGROUND

10.  Plaintiff Baumgardner began working for Tenacity in 1974 as a salesman, and worked his way up over the years to the position of Operations Manager.

11.  At various times over the years, LBS attempted to recruit Baumgardner away from Tenacity, but Baumgardner declined.

12.  In the fall of 2009, LBS again approached Baumgardner and attempted to convince him to leave Tenacity and to work for LBS. This time, Baumgardner and LBS were able to come to an agreement on the terms of his employment with LBS, and Baumgardner resigned from Tenacity and began working for LBS in January, 2010.

13.  Baumgardner and LBS entered into a written Employment Agreement (attached hereto as Exhibit A.) Paragraph 6 of the Employment Agreement, headed "Severance Package," provided for various payments to be made to Baumgardner in the event that his employment was terminated without "cause," and in the event that the company was sold ("Severance Payments.")

14.  The Employment Agreement specified in paragraph 6.a.i. that if LBS were sold during the time of Baumgardner's employment, and Baumgardner did not accept employment with the purchasing company, "The purchase agreement will include a provision which will pay [Baumgardner] for honoring a three (3) year non-compete agreement a monthly payment equal to one twelfth of his salary before the purchase for a period of 36 months, including an annual Cost of Living increase of 5%."

15.  The Employment Agreement also specified, in paragraph 6.a.iii., that if LBS were sold during the time of Baumgardner's employment, "[t]he purchase agreement will include a provision which will pay [Baumgardner] a lump sum of $250,000 at the closing of the sale."

- 4 -

16. The Employment Agreement also specified, in Paragraph 6.b.i., that if Baumgardner were terminated by LBS without "cause," as defined in the agreement, he would be entitled to "1. Monthly salary continuation for a period of 36 months including an annual Cost of Living increase equal to 5%; [and] 2. Continued payment of health insurance premiums equal to the percentage paid by [LBS] at the time of separation will continue for a period of one year . . ."

17. At no time was Baumgardner under any covenant not to compete with Tenacity, and there was no legal bar to his employment with LBS.

18. On April 13, 2010, Tenacity sued both Baumgardner and LBS in Hamilton County, Ohio alleging one count—Misappropriation of Trade Secrets—and seeking injunctive and monetary relief. (Case no. A1003621, Hamilton County Court of Common Pleas, Judge Dennis Helmick) (Hereinafter, the "Tenacity Lawsuit.")

19. During the course of the Tenacity Lawsuit, but completely unbeknownst to Baumgardner, LBS and William Oates, the owner of Tenacity, entered into negotiations with Patrick Williams and Scott Williams, owners of LBS, for the purchase of LBS by Oates, or by an entity under his control. These negotiations were kept secret from Baumgardner, and also from the attorney who was hired by LBS's insurance carrier to defend both LBS and Baumgardner in the Tenacity Lawsuit.

20. Upon information and belief, by April 2011, an agreement had been reached between Oates, Tenacity, Patrick Williams, Scott Williams, and LBS, and the sale of LBS to Oates, or to an entity under his control, was imminent. Baumgardner was not informed and knew nothing of this pending sale, and LBS actively and affirmatively concealed the fact of the pending sale from Baumgardner.

21.  Suddenly and without warning, on May 13, 2011, Baumgardner was informed by LBS that his employment contract was being terminated immediately for "cause."

22.  Baumgardner had done nothing that constituted "cause" for termination under the Employment Agreement.

23.  The sale of LBS to Oates was closed shortly after May 12, 2011.

24.  On June 21, 2011, Tenacity suddenly and without explanation voluntarily dismissed its claims against LBS in the Tenacity Lawsuit. However, Tenacity did not at that time dismiss its claims against Baumgardner.

25.  Upon information and belief, Oates, or an entity under his control, became the majority or controlling owner of LBS on or about June 20, 2011.

26.  After June 21, 2011, Tenacity demanded, through its attorney in the Tenacity Lawsuit, that Baumgardner agree not to compete with LBS in exchange for Tenacity's agreement to dismiss its claims against Baumgardner.

27.  Baumgardner had never signed a covenant not to compete with Tenacity, and LBS had breached the Employment Agreement by terminating Baumgardner without cause and failing and refusing to pay him any severance payments specified in the Employment Agreement. Baumgardner, through counsel, declined to agree not to work with a competitor of Tenacity or LBS.

28.  On July 22, 2011, Tenacity voluntarily dismissed, without prejudice, its claims against Baumgardner in the Tenacity Lawsuit.

## COUNT I

(Breach Of Employment Contract)

29.  Plaintiff reiterates the allegations contained in paragraphs 1 through 28 of the Complaint as if fully rewritten herein.

- 6 -

30.  Plaintiff has fulfilled all of his obligations under the Employment Agreement, and all
conditions precedent to receiving the Severance Payments have been fulfilled.

31.  LBS's termination of Plaintiff's Employment Agreement was without cause under the
terms of the Employment Agreement.

32.  LBS's termination of the Employment Agreement was motivated by its desire, and the
desire of Tenacity, which purchased it, to avoid the lump sum payment of $250,000 due
to Baumgardner under the contract upon the sale of LBS, and to avoid the 36 months of
severance payments due to Baumgardner for termination without cause.

33.  LBS has failed and refused to pay Plaintiff the payments he is due under the Employment
Agreement, which include:

    a)  Payment of 36 months of salary, with increases of 5% per
annum, for abiding by the non-compete provisions of the
Employment Agreement;

    b)  Payment of 36 months of salary, with increases of 5% per
annum, and payments of health insurance premiums for one
year, for being terminated without cause; and

    c)  Payment of a lump sum of $250,000 as a result of the sale
of LBS.

34.  As a result of LBS's breach of contract, Plaintiff has been damaged in an amount that
exceeds $970,000, the precise amount to be proved at trial.

### COUNT II

(Tortious Interference With Employment Contract By Tenacity And Oates)

35.  Plaintiff reiterates the allegations contained in paragraphs 1 through 34 as if fully
rewritten herein.

- 7 -

36.     Defendants Tenacity and Oates had knowledge of the Employment Agreement between Plaintiff and Defendant LBS.  More specifically, Tenacity and Oates had knowledge of the provisions in the Employment Agreement that required certain severance payments to be made to Plaintiff, and had knowledge of the provisions requiring that the obligation to make those payments be recorded in any purchase agreement between Tenacity and LBS.

37.     Tenacity and Oates tortiously interfered with the Employment Agreement by intentionally causing LBS to breach the Employment Agreement.  Specifically, upon information and belief Tenacity and Oates failed to include in the purchase agreement the Severance Payments that the Employment Agreement required be included therein.  In addition, Tenacity and Oates have prevented LBS from making the Severance Payments required of LBS in the Employment Agreement.

38.     Tenacity and Oates had no legal justification for interfering with the Employment Agreement.

39.     Tenacity's and Oates' tortious interference with the Employment Agreement was willful, wanton, and malicious.

40.     Tenacity's and Oates' tortious interference with the Employment Agreement has damaged Baumgardner as described herein.

## COUNT III

(Tortious Interference With Employment Contract By Patrick Williams And Scott Williams)

41.     Plaintiff reiterates the allegations contained in paragraphs 1 through 40 as if fully rewritten herein.

42.     Patrick Williams and Scott Williams had knowledge of the Employment Agreement between Plaintiff and Defendant LBS.  More specifically, Patrick Williams and Scott Williams had knowledge of the provisions in the Employment Agreement that required

- 8 -

certain severance payments to be made to Plaintiff, and had knowledge of the provisions requiring that the obligation to make those payments be recorded in any purchase agreement between Tenacity and LBS.

43. Patrick Williams and Scott Williams tortiously interfered with the Employment Agreement by intentionally causing LBS to breach the Employment Agreement. Specifically, upon information and belief, Patrick Williams and Scott Williams failed to include in the purchase agreement the Severance Payments that the Employment Agreement required be included therein. In addition, Patrick Williams and Scott Williams have prevented LBS from making the Severance Payments required of LBS in the Employment Agreement.

44. Patrick Williams and Scott Williams were acting in their own self-interests, and not in the interest of LBS, when they took the actions described herein and caused the breach of the Employment Agreement. Their actions were taken to benefit them personally; and upon information and belief, they did benefit personally from their actions.

45. Patrick Williams and Scott Williams had no legal justification for interfering with the Employment Agreement.

46. Patrick Williams' and Scott Williams' tortious interference with the Employment Agreement was willful, wanton, and malicious.

47. Patrick Williams' and Scott Williams' tortious interference with the Employment Agreement has damaged Baumgardner as described herein.

## COUNT IV

(Conspiracy To Breach And Interfere With Employment Contract)

48. Plaintiff reiterates the allegations contained in paragraphs 1 through 47 as if fully rewritten herein.

- 9 -

49.     Tenacity, Oates, LBS, Patrick Williams, and Scott Williams conspired to deprive Baumgardner of the Severance Payments to which he was entitled under the Employment Agreement. Specifically, the Defendants, working in concert directly and through their agents: Patrick

a)      Conspired to terminate Baumgardner's employment on the eve of the purchase of LBS by Oates in an effort to avoid making the Severance Payments to Baumgardner required by the Employment Agreement in the event of a sale of the company, thereby presumably raising the purchase price that Tenacity was willing to pay for LBS;

b)      Conspired to terminate Baumgardner's employment unjustifiably "for cause" on the eve of the purchase of LBS by Oates in an effort to avoid making the Severance Payments to Baumgardner required by the Employment Agreement in the event of his termination without cause; and

c)      Conspired to breach the Employment Agreement by refusing to pay Baumgardner any of the Severance Payments to which he was entitled.

50.     The Defendants acted maliciously, willfully, wantonly, and without justification in conspiring to terminate Baumgardner's Employment Agreement for alleged "cause" prior to the consummation of the sale of LBS, for the purpose of attempting to avoid their liability to Plaintiff for Severance Payments.

51.     Defendants' actions have damaged Baumgardner as described herein.

- 10 -

52.   To the extent that Defendant Kofile has assumed the liabilities of Defendants Tenacity or LBS, or is otherwise responsible for the obligations and actions of those Defendants, Kofile is responsible to Plaintiff for the damages alleged herein and demanded below.

**WHEREFORE**, Plaintiff Timothy Baumgardner demands judgment against Defendants Tenacity Manufacturing Company, Louisiana Binding Service, Inc., William D. Oates, Patrick Williams, and Scott Williams as follows:

A.   On Count I, for judgment against Louisiana Binding Service, Inc. in the amount of at least $970,000, the precise amount to be proved at trial;

B.   On Count II, for judgment against Tenacity Manufacturing Company and against William D. Oates, jointly and severally, in the amount of at least $970,000, plus punitive damages, the precise amount to be proved at trial;

C.   On Count III, for judgment against Patrick Williams and Scott Williams, jointly and severally, in the amount of at least $970,000, plus punitive damages, the precise amount to be proved at trial;

D.   On Count IV, for judgment against Louisiana Binding Service, Inc., Tenacity Manufacturing Company, William D. Oates, Patrick Williams, and Scott Williams, jointly and severally, in the amount of at least $970,000, plus punitive damages, the precise amount to be proved at trial;

E.   On all counts, against Kofile Preservation, Inc. in the amounts set forth herein, and on Counts II and IV, for punitive damages, to the extent that Kofile Preservation, Inc. has assumed or is responsible for the liabilities of the other Defendants.

F.   Prejudgment and postjudgment interest on amounts awarded on all claims;

G.   His costs, his attorneys fees, and all other relief to which he may be entitled.

- 11 -

## Jury Demand

Plaintiffs demand a trial by jury on all issues.


**TO THE CLERK:**   Please serve all defendants by certified mail, returnable according to law.


Respectfully submitted,


/s/ Robert A. Klingler
Robert A. Klingler (0031603)
ROBERT A. KLINGLER CO., L.P.A.
525 Vine Street, Suite 2320
Cincinnati, Ohio 45202-3133
Telephone:  (513) 665-9500
Facsimile:  (513) 621-3240
Email:  rak@klinglerlaw.com
TRIAL ATTORNEY FOR PLAINTIFF
TIMOTHY BAUMGARDNER

Joel L. Peschke (0072526
Joshua F. DeBra (0083267)
Calderhead Lockmeyer & Peschke
5405 Dupont Cir., Suite E
Milford, Ohio  45150
ATTORNEYS FOR PLAINTIFF TIMOTHY
BAUMGARDNER

- 12 -

# EMPLOYMENT AGREEMENT

THIS AGREEMENT, made and entered into this 14th day of January 2010, between Louisiana Binding Service, Inc. d/b/a **GOVERNMENT SUPPLIES AND BINDERS**™, with principal offices in DeRidder, Louisiana, hereinafter called "GSB" and Tim Baumgardner, hereinafter called "Business Development Manager".

## WITNESSED:

In consideration of the covenants and conditions of this Agreement, the parties hereto agree:

1.  GSB agrees to hire the Business Development Manager as an employee of GSB who shall be responsible for the sale of GSB's products and services to customers nationwide (*territory*) and subject to the terms and conditions hereinafter set forth.

2.  The term of this Agreement shall be three years from January 14, 2010 ("Commencement") and shall continue for successive one year periods thereafter.

3.  The assigned responsibilities which will be assumed by the Business Development Manager are fully described in Schedule A: "Job Description" which is made a part of this agreement. This Job Description may be adjusted and updated annually in order to adapt to changes in the market and structure of the GSB business model.

4.  Compensation and Benefit Package:

    a.  In lieu of a commission on sales, GSB agrees to pay the Business Development Manager a minimum annual salary of $120,000. This annual salary may be increased from time to time at the discretion of GSB.

    b.  A sign-on bonus of $30,000 will be paid 30 days after the Business Development begins employment with GSB and delivers a signed Promissory Note to the GSB corporate office, in DeRidder, LA in original form.

        i.  The purpose of the Promissory Note is to provide a mechanism to collect from the Business Development Manager the pro-rated balance of the note should termination occur as described below. (*Ex: If the Business Development Manager leaves voluntarily after 18 months he would owe $15,000 to GSB*). The pro-rated (monthly) balance Promissory Note issued by the Business Development Manager mention above will be due and payable under the following events:
            1.  The Business Development Manager terminates his employment before the end of 36 months;
            2.  The Business Development Manager is terminated for cause, as listed below;
        ii.  The pro-rated (monthly) balance of the Promissory Note issued by the Business Development Manager will not be due and payable under the following events:
            1.  The business is closed
            2.  The business is sold



1 | Page

# EMPLOYMENT AGREEMENT

    c. There is no formal annual performance bonus program and whether one is paid is completely at the discretion of GSB ownership.

    d. The Business Development Manager is eligible to participate in the benefit plans maintained by GSB for employees in accordance with the terms and conditions of those plans. See the attached Personnel Policy which describes those benefits in full.
        i. Currently GSB pays 30% of the cost of employee health insurance group policy for management personnel
        ii. Currently GSB makes a dollar for dollar match of IRA contributions up to 3% of gross salary. Contribution matching starts after 3 years of employment.
        iii. Refer to plan for other scheduled benefits
        iv. Company benefit plans are subject to adjust annually
        v. Management personnel must arrange to have their work handled in their absence due to vacation, sick days or personal time off. There is no specified number of days off for these purposes, however, time off can be taken as long as the work is either handled remotely or handled by other personnel who have agreed to cover for vacationing management.

    e. GSB will pay the Business Development Manager $1,500 monthly rent for use of the office in his personal residence.

5. Additional business expenses paid:
    a. Cost of connection and monthly expenses for mobile telephone and Internet service
    b. Cost of required electronic equipment such as mobile telephone, computers and printers and the supplies and maintenance of that equipment
    c. Reimbursed at $0.45 per mile for business travel; subject to change
        i. A monthly mileage report must be submitted by the 5th of the following month prior to reimbursement
    d. Cost of airfare, rental car and hotel while on business travel
    e. Cost of Business Development Manager meals while on business travel
    f. Cost of business meals with existing or prospective customers

6. Severance Package
    a. Sale of Louisiana Binding Service, Inc. and/or of **GOVERNMENT SUPPLIES AND BINDERS**™:
        i. In the event of a sale of the company and the Business Development Manager does not accept a job with the purchasing company, the Business Development Manager is entitled to the following compensation:
            1. The purchase agreement will include a provision which will pay the Business Development Manager for honoring a three (3) year non-compete agreement a monthly payment equal to one twelfth of his salary before the purchase for a period of 36 months, including an annual Cost of Living increase of 5%. Violating the Confidentiality, Non-Competition / Non Solicitation Agreement made a part of this document would give the purchasing company the option of discontinuing the monthly payment.
            2. All company equipment and business records, including customer contact records and documentation related to sales completed, in progress or in discussion have been returned to GSB.

2 | P a g e

# EMPLOYMENT AGREEMENT

   ii.  In the event of a sale of the company and the purchasing company wants to offer the Business Development Manager a job with the purchasing company, the Business Development Manager is entitled to the following compensation:

      1.  The purchase agreement will include a provision which will require that the Business Development Manager is paid a minimum of $120,000 annually for 3 years, including an annual Cost of Living increase of 5%, regardless of what position is offered.

   iii.  In the event of a sale of the company whether the Business Development Manager accepts a job with the purchasing company or not, the Business Development Manager, if still employed by GSB, is entitled to the following compensation to be paid at the time of the sale of the company:

      1.  The purchase agreement will include a provision which will pay the Business Development Manager a lump sum of $250,000 at the closing of the sale.

b. Termination without cause

   i.  In the event that Louisiana Binding Service, Inc. and/or of **GOVERNMENT SUPPLIES AND BINDERS**™ terminates the employment of the Business Development Manager, without cause he shall be entitled to the following severance package:

      1.  Monthly salary continuation for a period of 36 months including an annual Cost of Living increase equal to 5%.

      2.  Continued payment of health insurance premiums equal to the percentage paid by GSB at the time of separation will continue for a period of one year, thereafter, policy continuation is at the Business Development Manager's cost for a term in compliance with Cobra or the applicable Federal regulation(s) in effect at the time.

      3.  All other benefits will be discontinued.

      4.  Salary continuation payments shall commence once all company equipment and business records, including customer contact records and documentation related to sales completed, in progress or in discussion have been returned to GSB.

c. Termination with cause

   i.  No salary will be paid or any benefits extended, paid or otherwise, except as required by Federal laws and regulations, after the date of separation if the Business Development Manager is terminated for "Cause".

      1.  Cause in this agreement means:

         a.  an intentional act of fraud, embezzlement, theft or any other material violation of law that occurs during or in the course of employment with GSB;

         b.  intentional damage to company assets;

         c.  intentional disclosure of company's confidential information contrary to company policies and non-disclosure agreements;

         d.  breach of the Business Development Manager's obligations under this agreement;

         e.  intentional engagement in any competitive activity which would constitute a breach of your duty of loyalty or of your obligations under this agreement;

         f.  intentional breach of any of GSB's policies;

3 | Page

# EMPLOYMENT AGREEMENT

g. the willful and continued failure to substantially perform assigned duties for GSB (*other than as a result of incapacity due to physical or mental illness*);

h. Willful conduct by the Business Development Manager that is demonstrably and materially injurious to GSB, monetarily or otherwise.

2. All company equipment and business records, including customer contact records and documentation related to sales completed, in progress or in discussion have been returned to GSB.

For purposes of this paragraph, an act, or a failure to act, shall not be deemed willful or intentional, as those terms are defined herein, unless it is done, or omitted to be done, by the Business Development Manager in bad faith or without a reasonable belief that his/her actions or omissions were in the best interest of GSB. Failure to meet performance standards or objectives, by itself, does not constitute "Cause" also includes any of the above grounds for dismissal regardless of whether GSB learns of it before or after terminating his/her employment.

7. Confidentiality, Non-Competition / Non Solicitation Agreement:

a. The Business Development Manager acknowledges that he has signed a Confidentiality, Non-Competition / Non Solicitation Agreement dated December 10, 2009. That same Confidentiality, Non-Competition / Non Solicitation Agreement has been made a part of this agreement (*see below*) with the only change being an increase in term to three (3) years to coincide with the provisions of the severance package discussed above. Signing this Employment Agreement binds the Business Development Manager to the Confidentiality, Non-Competition / Non Solicitation Agreement as included as a part of this Agreement. The Business Development Manager agrees that the language in the Confidentiality, Non-Competition / Non Solicitation Agreement made a part of this Agreement supersedes and takes precedent over the Confidentiality, Non-Competition / Non Solicitation Agreement signed in December 2009.

4 | Page

# EMPLOYMENT AGREEMENT

## CONFIDENTIALITY, NON-COMPETITION AND NON-SOLICITATION AGREEMENT

THIS AGREEMENT made as of the same date as the execution of the Employment Agreement of which is has been made a part, between Pat Williams, of LOUISIANA BINDING SERVICE, INC. and/or of **GOVERNMENT SUPPLIES AND BINDERS** (hereinafter referred to as GSB) and Tim Baumgardner (hereinafter referred to as Business Development Manager).

**WHEREAS** the Business Development Manager and GSB have entered into or are about to enter into an employment relationship for their mutual benefit;

**AND WHEREAS** as a condition of entering into and/or continuing such employment relationship, the GSB has required that the Business Development Manager enter into this agreement.

**NOW THEREFORE IN CONSIDERATION OF** the premises and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereby agree as follows:

I.   **Definitions.** Whenever used in this agreement the following words and phrases shall have the following respective meanings:

II.   **"Affiliate"** means only any entity a majority of whose voting shares or securities are owned or controlled directly or indirectly by GSB or the shareholders of GSB, or whose control is held by the GSB or shareholders of GSB.

III.   **"Confidential Information"** means information in any form , not generally known to the public, disclosed to or acquired by the Business Development Manager directly or indirectly from the GSB or any clients, business partners or affiliates of GSB during the term of the Business Development Manager's employment with GSB, including, without limitation:

   a.   information relating to the research, developments, systems, operations, clients and business activities of GSB or its business partners or Affiliates;

   b.   information received from any clients, business partners or Affiliates of GSB;

   c.   information specifically designated by GSB as confidential;

   d.   information specifically designated by a client, business partner or Affiliate of GSB as confidential; and

   e.   information required to be maintained in confidence by GSB pursuant to an agreement with a client, business partner, associate or other person;

# EMPLOYMENT AGREEMENT

    f.  But shall not include any information which was known to the Business Development Manager prior to the date of the Business Development Manager's employment with GSB or which was publicly disclosed otherwise than by breach of this Agreement.

IV.    **Confidentiality.** The Business Development Manager acknowledges that (i) during his or her employment with GSB, he or she will be disclosed or will acquire Confidential Information; (ii) GSB has and will continue to enter agreements with clients and others whereby GSB agrees to maintain the confidentiality of certain information; (iii) disclosure of Confidential Information to others with be highly detrimental to both interests of GSB and/or its clients, business partners of Affiliates, as the case may be. Accordingly, the Business Development Manager agrees that:

    a.  the Business Development Manager will not, at any time, disclose Confidential Information to any other person not an employee of GSB, nor will the Business Development Manager use Confidential Information for any purpose other than required by his or her employment; and

    b.  The Business Development Manager will not, at any time, or in any way, take or reproduce Confidential Information unless required by his or her employment. The Business Development Manager will, upon ceasing to be employed by GSB, return to GSB all Confidential Information in his or her possession or under his or her control whether such Confidential Information belongs to GSB or otherwise. The Business Development Manager will also return all property then in his or her possession or under his or her control which belongs to GSB or its Affiliates.

V.    **Non-Competition and Non-Solicitation.** The Business Development Manager acknowledges that he or she will acquire considerable knowledge about, and expertise in, certain areas of GSB's business and that he or she will have knowledge of, and contact with, customers and suppliers of GSB and its Affiliates. The Business Development Manager further acknowledges that he or she may well be able to utilize such knowledge and expertise, following termination of his or her service with GSB, to the serious detriment of GSB in the event that the Business Development Manager should solicit business from customers of GSB or its affiliates. Accordingly, the Business Development Manager agrees that:

VI.    **Non-Competition.** During his or her employment and for a period of three (3) years after termination of his or her employment, the Business Development Manager will not in any way be associated with or involved, directly or indirectly, with any person, from, corporation or other entity engaged in any business which provides services substantially similar to the services provided by GSB or its Affiliates within the United States of America.

# EMPLOYMENT AGREEMENT

VII.    **Non-Solicitation of Customers.** The Business Development Manager will not, for a period of three (3) years after termination of his or her employment, directly or indirectly, approach any customer or business partner of GSB or its Affiliates for the purpose of providing services substantially similar to the services provided by GSB or its affiliates: and

VIII.   **Non-Solicitation of Employees.** The Business Development Manager will not, for a period of three (3) years after termination of his or her employment, directly or indirectly, approach, solicit, entice or attempt to approach, solicit or entice any of the other employees of GSB or its Affiliates to leave the employment of GSB.

IX.    **Restrictions Reasonable.** The Business Development Manager acknowledges that all restrictions in this Agreement are reasonable in the circumstances and hereby waives all defenses to the enforcement thereof by GSB. In the event that any provisions of the Agreement shall be deemed void or invalid by a court of competent jurisdiction, the remaining provisions shall be and remain in full force and effect the Business Development Manager hereby confers upon such court the power to replace such void or invalid provisions with such other enforceable and valid provisions as shall be as near as may be to the original in form and effect.

X.    **Irreparable Harm.** The Business Development Manager acknowledges that breach by him or her of the terms and conditions of this Agreement may cause irreparable harm to GSB which may not be compensable by monetary damages. Accordingly, the Business Development Manager acknowledges that a breach by him/her of the terms and conditions of this agreement shall be sufficient grounds for granting of an injunction and the suit of GSB by a court of competent jurisdiction.

XI.    **Governing Law.** The Agreement shall be governed by and construed in accordance with the laws of the State of Louisiana.

XII.    **Entire Agreement.** This Agreement is the entire agreement between the Business Development Manager and GSB relating to the subject matter hereof and stands in the place of any previous agreement, whether oral or in writing. The Business Development Manager agrees that no amendment to this Agreement shall be binding upon the parties unless it is in writing and executed by both parties.

XIII.    **Successors and Assigns.** This Agreement will inure to the benefit of the successors and assigns of GSB.

*END OF CONFIDENTIALITY, NON-COMPETITION, NON SOLICITATION AGREEMENT*

ELECTRONICALLY FILED 09/30/2011 15:37 / IFOJ / A 1107816 / CONFIRMATION NUMBER 103240

# EMPLOYMENT AGREEMENT

8. The Business Development Manager agrees to endeavor diligently and in good faith to promote sales of products in the Territory to the fullest extent possible. Business Development Manager agrees not to represent any concern making or selling products similar to or competitive with GSB products.

9. All orders for the products covered hereby shall be priced by Pat Williams or his designate; it being understood that GSB reserves the right to change price at any time. The Business Development Manager in soliciting sales shall quote and contract only such prices and terms for the products covered hereby as are set forth in the current price schedules and terms as may hereinafter be established by GSB. The Business Development Manager shall only offer warranties and guarantees as detailed in the pricing schedules.

10. Business Development Manager agrees to comply with company policies of GSB, as now or hereafter established, or which he has or shall have received written notice.

11. In the event of expiration of any termination hereof by either party, GSB shall have the right to appoint a new Business Development Manager for the Customers, effective immediately upon any termination, and the terminated Business Development Manager shall immediately turn over to GSB all business records, products and other property of GSB. In such case, the Business Development Manager is prohibited from retaining, copying or maintaining customer records, whether digital or in other forms or media.

12. Business Development Manager shall immediately notify GSB of any customer or consumer complaint, suit, or threat of suit and shall forward to GSB all relevant documentation. The handling of such complaints suits or threats of suit shall be entirely at the discretion of GSB.

13. This Agreement shall bind and inure to the benefit of the parties hereto, and the successors and assigns of GSB, but shall not be assignable on the part of the Business Development Manager.

14. This Agreement may be executed in any number of counterparts, each of which when so executed, shall be deemed to be an original.

15. Severability: If any provision in the contract is found unenforceable, the parties agree that it can be severed from the contract while the remaining provisions remain in force.

16. This Agreement reflects the entire agreement of the parties and supersedes any other agreements whether written or oral and can only be amended in writing and signed by both parties.

## EMPLOYMENT AGREEMENT

IN WITNESS WHEREOF, the parties have executed this Agreement on the date and year above written.

TIM BAUMGARDNER

LOUISIANA BINDING SERVICE, INC.
d/b/a **GOVERNMENT SUPPLIES AND BINDERS**™

_Tim Baumgardner_ _____

By _____
PRESIDENT

Date ___ 1-25-10 _____

Date ___ 1/14/10 _____

9 | P a g e

# EMPLOYMENT AGREEMENT

## SCHEDULE "A"

**Job Description**

**Job Title:** Business Development Manager
**Reports To:** Vinnie
**Department:** Sales
**Location:** Ohio
**Prepared By/Date:** EJD 12/09
**Approved By/Date:** Pat Williams

**Summary:** Responsible for development overall sales of Government Supplies and Binders products and services.

**Essential Duties and Responsibilities** include the following. Other duties may also be assigned.

- Acquiring new customers for the sale of GSB products and services based on established relationships of the Business Development Manager through direct sales calls, follow-up and on-site visits;

- Acquiring new customers for the sale of GSB products and services through referral and new lead development;

- Responsible for Sales, Customer service of his customer base, order entry, collection of problem accounts, hiring and firing of his staff, creation of promotional material, brochures, etc;

- Involved in providing input on new product development and product improvement;

- Travels throughout assigned territory calling on regular and prospective customers to display or demonstrate products and solicit orders using samples or brochures which emphasize product features;

- Quotes prices and credit terms and prepares sales contracts for orders obtained;

- Estimates date of delivery to customer, based on knowledge of own firm's production and delivery schedules;

- Prepares sales reports and order status reports and keeps general business records in traditional format including customer records, transactions records and expense accountings;

- Coordinates customer training;

- Enters new customer data and other sales data for current customers into computer

10 | P a g e

# EMPLOYMENT AGREEMENT

database;

- Develops and maintains relationships with customer base, both purchasing managers and decision makers;

- Investigates and resolves customer issues;

- Collect problem accounts receivable;

- Attends trade shows.

**Competency:**
To perform the job successfully, an individual should demonstrate the following competencies:

- **Analytical** - Synthesizes complex or diverse information; Collects and researches data; Uses intuition and experience to complement data; Designs work flows and procedures.
- **Design** - Generates creative solutions; Translates concepts and information into images; Uses feedback to modify designs; Applies design principles; Demonstrates attention to detail.
- **Problem Solving** - Identifies and resolves problems in a timely manner; Gathers and analyzes information skillfully; Develops alternative solutions; Works well in group problem solving situations.
- **Project Management** - Develops project plans; Coordinates projects; Communicates changes and progress; Completes projects on time and budget.
- **Customer Service** - Manages difficult or emotional customer situations; Responds promptly to customer needs; Solicits customer feedback to improve service; Responds to requests for service and assistance; Meets commitments.
- **Interpersonal** - Focuses on solving conflict, not blaming; Maintains confidentiality; Listens to others without interrupting.
- **Oral Communication** - Speaks clearly and persuasively in positive or negative situations; Listens and gets clarification; Responds well to questions; Demonstrates group presentation skills; Participates in meetings.
- **Team Work** - Balances team and individual responsibilities; Exhibits objectivity and openness to others' views; Gives and welcomes feedback.
- **Written Communication** - Writes clearly and informatively; Edits work for spelling and grammar; Varies writing style to meet needs; Presents numerical data effectively; Able to read and interpret written information.
- **Change Management** - Develops workable implementation plans; Communicates changes effectively; Builds commitment and overcomes resistance; Prepares and supports those affected by change; Monitors transition and evaluates results.
- **Quality Management** - Looks for ways to improve and promote quality; Demonstrates accuracy and thoroughness.
- **Visionary Leadership** - Displays passion and optimism; Inspires respect and trust; mobilizes others to fulfill the vision; Provides vision and inspiration to peers and subordinates.

ELECTRONICALLY FILED 09/30/2011 15:37 / IFOJ / A 1107816 / CONFIRMATION NUMBER 103240

# EMPLOYMENT AGREEMENT

- **Business Acumen** - Understands business implications of decisions; Displays orientation to profitability; Demonstrates knowledge of market and competition; Aligns work with strategic goals.
- **Cost Consciousness** - Works within approved budget; Develops and implements cost saving measures; Contributes to profits and revenue; Conserves organizational resources.
- **Ethics** - Treats people with respect; Keeps commitments; Works with integrity and ethically; Upholds organizational values.
- **Organizational Support** - Follows policies and procedures; Completes administrative tasks correctly and on time; supports organization's goals and values; Benefits organization through outside activities.
- **Strategic Thinking** - Develops strategies to achieve organizational goals; Understands organization's strengths & weaknesses; Analyzes market and competition; Identifies external threats and opportunities; Adapts strategy to changing conditions.
- **Adaptability** - Adapts to changes in the work environment; Manages competing demands; Changes approach or method to best fit the situation; Able to deal with frequent change, delays, or unexpected events.
- **Attendance/Punctuality** - Is consistently at work and on time; Ensures work responsibilities are covered when absent; Arrives at meetings and appointments on time.
- **Dependability** - Follows instructions, responds to management direction; Takes responsibility for own actions; Keeps commitments; Commits to long hours of work when necessary to reach goals; Completes tasks on time or notifies appropriate person with an alternate plan.
- **Initiative** - Undertakes self-development activities; Seeks increased responsibilities; Takes independent actions and calculated risks; Looks for and takes advantage of opportunities; Asks for and offers help when needed.
- **Innovation** - Displays original thinking and creativity; Meets challenges with resourcefulness; Generates suggestions for improving work; Develops innovative approaches and ideas; Presents ideas and information in a manner that gets others' attention.
- **Judgment** - Displays willingness to make decisions; Exhibits sound and accurate judgment; Supports and explains reasoning for decisions; Includes appropriate people in decision-making process; Makes timely decisions.
- **Motivation** - Sets and achieves challenging goals; Demonstrates persistence and overcomes obstacles; Measures self against standard of excellence; Takes calculated risks to accomplish goals.
- **Planning/Organizing** - Prioritizes and plans work activities; Uses time efficiently; Plans for additional resources; Sets goals and objectives.
- **Professionalism** - Approaches others in a tactful manner; Reacts well under pressure; Treats others with respect and consideration regardless of their status or position; Accepts responsibility for own actions; Follows through on commitments.
- **Quality** - Demonstrates accuracy and thoroughness; Looks for ways to improve and promote quality; Applies feedback to improve performance; Monitors own work to ensure quality.
- **Quantity** - Meets productivity standards; Completes work in timely manner; Strives to increase productivity; Works quickly.

# EMPLOYMENT AGREEMENT

- **Safety and Security** - Observes safety and security procedures; Determines appropriate action beyond guidelines; Reports potentially unsafe conditions; Uses equipment and materials properly.

**Qualifications:**
- To perform this job successfully, an individual must be able to perform each essential duty satisfactorily.

- The requirements listed below are representative of the knowledge, skill, and/or ability required.

- Reasonable accommodations will be made to enable individuals with disabilities to perform the essential functions.

**Education/Experience:**
- Bachelor's degree from four-year college or university; or one to two years related experience and/or training; or equivalent combination of education and experience.

**Language Ability:**
- Ability to read, analyze, and interpret general business periodicals, professional journals, technical procedures, or governmental regulations.
- Ability to write reports, business correspondence, and procedure manuals.
- Ability to effectively present information and respond to questions from groups of managers, clients, customers, and the general public.

**Math Ability:**
- Ability to work with mathematical concepts such as probability and statistical inference, and fundamentals of plane and solid geometry and trigonometry.
- Ability to apply concepts such as fractions, percentages, ratios, and proportions to practical situations.

**Reasoning Ability:**
- Ability to solve practical problems and deal with a variety of concrete variables in situations where only limited standardization exists.
- Ability to interpret a variety of instructions furnished in written, oral, diagram, or schedule form.

**Computer Skills:**
- To perform this job successfully, an individual should have knowledge of Word Processing software; Spreadsheet software; Design software; Project Management software, Contact Management systems and digital folders systems for filing digital files. The Business Development Manager should also be proficient in the use of E-Mail and use of the Internet.

# EMPLOYMENT AGREEMENT

**Certificates and Licenses:**
- No certifications needed

**Supervisory Responsibilities:**
- This job will require the supervision of all employees hired to work in this division. These skills include hiring and firing personnel, assigning responsibilities to personnel and holding personnel accountable for performance. Annual performance reviews will also be required when personnel are hired for this division.

**Work Environment:**
- The work environment characteristics described here are representative of those a Business Development Manager encounters while performing the essential functions of this job.

- Reasonable accommodations will be made to enable individuals with disabilities to perform the essential functions.

**Physical Demands:**
- The physical demands described here are representative of those that must be met by a Business Development Manager to successfully perform the essential functions of this job. Reasonable accommodations may be made to enable individuals with disabilities to perform the essential functions.

- The Business Development Manager must occasionally lift and/or move up to 50 pounds.

- While performing the duties of this job, the Business Development Manager is frequently required to use hands to finger, handle, or feel and talk and hear. The Business Development Manager is occasionally required to stand; walk; sit; reach with hands and arms and stoop, kneel, crouch, or crawl.

. ELECTRONICALLY FILED 09/30/2011 15:37  /  IFOJ  /  A 1107816  /  CONFIRMATION NUMBER 103240